# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DEBRA DAVIS**, | Case No. 3:12-cv-0808-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **TRI-COUNTY METROPOLITAN TRANSPORTATION DISTRICT OF OREGON**, | |
| Defendant. | |

Daniel Snyder, Carl Post, and Cynthia Gaddis, LAW OFFICES OF DANIEL SNYDER, 1000 S.W. Broadway, Suite 2400, Portland, OR 97205. Of Attorneys for Plaintiff.

Gregory E. Skillman and Kimberly Sewell, TriMet, 1800 S.W. First Avenue, #300, Portland, OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Plaintiff Debra Davis ("Davis") asserts ten claims against her employer, Tri-County Metropolitan Transportation District of Oregon ("TriMet").[1] Davis alleges that TriMet: (1) failed to give her the proper veteran's preference in hiring as required under Oregon Revised Statutes ("O.R.S.") § 408.230; (2) discriminated and retaliated against her for filing a worker's

---

[1] Plaintiff is still employed by TriMet but has been on permanent disability since March 12, 2012.

PAGE 1 – OPINION AND ORDER

compensation claim, in violation of O.R.S. § 659A.040; (3) failed to reemploy her in a suitable

position, in violation of O.R.S. § 659A.046; (4) discriminated against her because of her

disability, in violation of Oregon's Rehabilitation Act, O.R.S. § 659A.103 *et seq.*;

(5) discriminated and retaliated against her because of her race, in violation of O.R.S.

§ 659A.030; (6) discriminated against her because of her disability, in violation of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12112; (7) retaliated against her because she

engaged in activity protected under the ADA, in violation of the ADA; (8) violated her rights

under the Family and Medical Leave Act ("FMLA"); (9) violated her rights under the Oregon

Family Leave Act ("OFLA"); and (10) wrongfully discharged her in violation of Oregon

common law.

TriMet moves for summary judgment against all of Davis's claims. For the reasons that

follow, TriMet's motion is granted in part and denied in part. TriMet's motion is granted with

respect to Davis's failure to reemploy claim and wrongful discharge claim. TriMet's motion with

respect to the other eight claims is largely denied, although the Court grants Defendant's motion

with respect to certain alleged adverse actions and other matters, as set forth below.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

Where the non-moving party bears the burden of proof at trial, the movant need only point out an absence of evidence supporting the non-moving party's case to satisfy the movant's burden on summary judgment. *Celotex Corp.*, 477 U.S. at 322-23. After the moving party satisfies its initial burden, the burden shifts to the non-moving party to "'designate specific facts showing that there is a genuine issue for trial.'" *Makaeff v. Trump Univ., LLC*, 736 F.3d 1180, 1189 (9th Cir. 2013) (quoting *Celotex Corp.*, 477 U.S. at 324). The moving party is entitled judgment as a matter of law "[i]f the non-moving party fails to make this showing." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Celotex Corp.*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

## BACKGROUND

This section sets forth broad, general facts relevant to the pending motion. Facts specifically relevant to a particular claim are discussed in more detail in the analysis of that claim.

### A.  The Parties

TriMet is a mass transit district established under O.R.S. Chapter 267. Davis is an African-American woman and a veteran. She served in the military from 1984 through 1992, when she was honorably discharged. While in the military, Davis worked in positions equivalent

to, among others, a superintendent of transportation, a transportation-maintenance supervisor, a garage supervisor, and a driver supervisor.

## B.  Davis's Work at TriMet

Davis began working at TriMet in July, 1993 as a Maintenance Helper. She held several positions of increasing responsibility, including as a Journeyman Mechanic, until she was promoted to Assistant Manager, Field Operations in March 2007. In July 2009, TriMet reduced its managerial workforce and laid off approximately 21 managerial and other non-union employees, including Davis. Davis was able to revert to her previous union position of Journeyman Mechanic when she was laid off from her managerial position.

Throughout her career at TriMet, Davis attended many leadership courses, training courses, and program-specific courses in her field. She obtained two Associate's degrees, a Bachelor's degree, and numerous specialized certificates in the rail and transportation fields. As relevant to this lawsuit, Davis applied for several supervisory and managerial positions at TriMet from May 2009 through March 2012. She was not hired for any of those positions.

## C.  Davis's Injury and Worker's Compensation Claim

On August 13, 2009, Davis suffered an on-the-job injury. She invoked the Worker's Compensation system for this injury. On August 25, 2009, she was released to work modified duty with certain restrictions. TriMet offered her certain "light duty" short term positions, some of which Davis worked at for a few days and others she declined because they were not consistent with her medical restrictions.

On November 19, 2009, Davis's worker's compensation claim was closed. TriMet determined, based on a report from Derrick H. Yoshinga, D.O., that Davis's continuing physical limitations relating to her back were caused by a pre-existing condition and not the on-the-job injury. TriMet then stopped offering Davis "light duty" work.

PAGE 4 – OPINION AND ORDER

Davis appealed the worker's compensation denial. On April 25, 2011, an Administrative Law Judge ("ALJ") concluded that the November 19, 2009 denial was procedurally invalid and remanded the denial to TriMet for processing according to law. This opinion was affirmed by the Worker's Compensation Board on April 2, 2012, and by the Oregon Court of Appeals on January 23, 2014.

On February 22, 2010, Davis obtained a report from Dr. Patrick Tester, concluding that Davis's ongoing back problems were due to her on-the-job injury. Davis sought to re-open her worker's compensation claim, and on March 19, 2012, a different ALJ denied Davis's request. This decision was upheld by the Worker's Compensation Board and Davis did not appeal it to the Oregon Court of Appeals.

Davis consulted with Dr. Paul Puziss. On January 12, 2013, Dr. Puziss authored a letter in which he diagnosed Davis with facet syndrome and opined that it was caused by her workplace injury. Dr. Puziss diagnosed Davis with four different back-related problems and opined that all of them were caused by her workplace injury. Dr. Puziss further opined that Dr. Yoshinga had misdiagnosed Davis. On February 5, 2013, Davis requested TriMet accept or deny these four back conditions, claiming that they were related to her August 2009 workplace injury. TriMet denied this request and Davis has appealed that denial. That appeal is currently pending.

**D.  Davis's Requests for Accommodation**

From November 2009 through February 2010, Davis obtained medical releases to work with restrictions and repeatedly requested that accommodations be made for those physical restrictions. TriMet did not engage in discussions relating to any such accommodations until February 2010, after Davis had used all of her sick leave, vacation time, and protected leave, and had begun taking unpaid leave.

In March and April 2010, TriMet scheduled an ergonomics assessment for Davis and complied with all of the recommended accommodations except the purchasing of a particular tool, which TriMet believed was covered under TriMet's tool allowance given to Davis pursuant to the labor agreement between TriMet and the union representing Davis. On March 23, 2010, Davis returned to her former position as a Journeyman Mechanic.

Davis continued to have ongoing physical restrictions and problems related to her back injury. On several occasions she requested additional ergonomic assessments and accommodations. She continued to use her available sick, vacation, and protected leave, and she took unpaid leave time when her paid leave was exhausted. TriMet regularly sent letters to Davis documenting her absences, notifying her that she was in violation of TriMet's attendance policy, and informing her that she needed to meet with her supervisors to address her absenteeism. In June, July, and September 2012, TriMet issued to Davis escalating warnings and reprimands for absenteeism. In September 2012, concerned that she would be terminated for absenteeism, Davis applied for permanent disability, and her application was accepted on October 22, 2012, with an effective date of March 12, 2012.

## DISCUSSION

Davis alleges ten claims for relief and TriMet moves for summary judgment against all of them. Each claim is discussed below, in turn.

## A.  First Claim for Relief—Veteran's Preference

Davis alleges that TriMet failed properly to give Davis the veteran's preference points she is entitled to under O.R.S. § 408.225, *et seq.* ("Veteran's Preference Statute"). TriMet argues that it was not required to give Davis veteran's preference points before January 1, 2010, because TriMet was not a "public employer" as defined by the Veteran's Preference Statute until the statute was amended, effective January 1, 2010. TriMet also argues that for the jobs to which

Davis applied after January 1, 2010, TriMet properly applied the necessary veteran's preference points at one stage in the hiring process, which is all that the statute requires.

Davis responds that TriMet was a "public employer" before the January 1, 2010 amendment, and that pursuant to the statutory requirements throughout the relevant time period, TriMet was obligated, and failed, to provide Davis veteran's preference points at each stage of the hiring process. Davis argues that the Veteran's Preference Statute does not permit employers to choose only one stage of the hiring process at which to apply preference points, but that the employer must instead apply preference points at each stage of the hiring process. The Court begins its analysis by interpreting the Veteran's Preference Statute.

### 1. Statutory construction

The Court interprets the Veteran's Preference Statute and other relevant statutes applying Oregon statutory interpretation principles. *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1209 (9th Cir. 2010) (a federal court interpreting Oregon law "interpret[s] the law as would the Oregon Supreme Court") (quotation marks omitted). Under Oregon law, the "paramount goal" of statutory interpretation is to discern the legislature's intent. *State v. Gaines*, 346 Or. 160, 171 (2009). To best attain this goal, "the first step" of statutory interpretation is an examination of the text and context of the statute, which is the best evidence of the legislature's intent. *Id.* "After examining the text and context," the court may consult the legislative history, if there is legislative history that is useful to the court's analysis.[2] *Id.* at 172. If the legislature's intent remains unclear after examining text, context, and legislative history, the court may "resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Id.*

---

[2] Neither party provided any relevant legislative history relating to the statutory interpretation at issue.

### a. Whether TriMet was a "public employer" under the Veteran's Preference Statute throughout the relevant time period

TriMet asserts that before the Veteran's Preference Statute was amended in 2009, effective January 1, 2010, changing the definition of a "public employer," TriMet was not a "public employer" under that statute and was therefore not required to provide Davis any veteran's preference points until January 1, 2010 and after.

In 2007 the Veteran's Preference Statute was amended, effective June 20, 2007. This amendment removed the requirement that veteran's preference points only had to be provided for positions in which a civil service examination was given, and added that veteran's preference points had to be provided by a "public employer" for a "vacant civil service position." Or. Laws 2007, Ch. 525, §§ 1-2 (codified at *former* O.R.S. §§ 408.225(c) and 408.230 (2007)). With this amendment, a public employer was defined as "the state or any agency or political subdivision of the state . . . ." Or. Laws 2007, Ch. 525, § 1 (codified at *former* O.R.S. § 408.225(c) (2007)).[3] TriMet asserts that it is not a "political subdivision" of the state, but offers no authority for that proposition.

The Oregon statute relating to the creation and power of mass transit districts, although not specifically enumerating the Veteran's Preference Statute, defined a mass transit district at all relevant times as both a "public employer" and a "political subdivision" for certain enumerated Oregon statutes, without stating that those statutes are the only contexts in which a mass transit district serves in either of those capacities. O.R.S. § 267.200. Courts have found TriMet to be a political subdivision of the state outside the contexts of the statutes enumerated in § 267.200. *See*

---

[3] After the 2009 amendment (effective January 1, 2010), "public employer" was defined as a "public body, as that term is defined in O.R.S. 174.109." O.R.S. § 408.225(1)(d). In turn, O.R.S. § 174.109 defines a public body to include "local government bodies." TriMet does not dispute that it is a "local government body" and that, thus, the Veteran's Preference Statute applies to it after January 1, 2010.

*Gugler v. Baker Cnty. Educ. Serv. Dist.*, 305 Or. 548, 554 (1988) (discussing *Girt v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 4 Or. T.C. 92 (1970) and noting that because TriMet was a political subdivision of the state, it could levy a payroll tax under a statute that authorized a political subdivision to levy such a tax); *Ballard v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 2011 WL 1337090, at *18 (D. Or. Apr. 7, 2011) (finding TriMet exempt from the Labor Management Relations Act because it is a political subdivision of the state); *Feist v. Dep't of Revenue*, 18 Or. Tax 471, 475 (Or. T.C. 2003) (finding TriMet a political subdivision of the state for purposes of the Amtrak Act and stating that "[i]t is the court's conclusion that the Oregon Legislature intended mass transit districts like Tri-Met be considered political subdivisions of the state"). TriMet points to no case, and the Court has found none, where a court held that TriMet was not a political subdivision of the state.

Additionally, TriMet admitted in a Request for Admission ('RFA") propounded by Davis during discovery that "[f]rom March 1, 2007 to the present [TriMet] was a political subdivision of the State of Oregon." RFA 264. TriMet is bound by that admission. *See* Fed. R. Civ. P. 36(b). TriMet's argument that it did not need to give any veteran's preference points to Davis before January 1, 2010, because TriMet was not a political subdivision of the state and, thus, not a "public employer" for purposes of the Veteran's Preference Statute is, therefore, rejected. Under the circumstances of this case, the Court finds that throughout the relevant time period TriMet was a political subdivision of the state and thus a "public employer" for purposes of the Veteran's Preference Statute.

In addition to limiting the application of the Veteran's Preference Statute to "public employers," the statute also limits its applicability to a "vacant civil service position." TriMet argues that because it did not use civil service examinations it did not have "civil service

positions" as required in the Veteran's Preference Statute. This argument also is unavailing. When the Veteran's Preference Statute was amended in 2007, it expanded its applicability to civil service positions that did not require a civil service examination.[4] Thus, the fact that TriMet does not use civil service examinations does not mean that its positions are not civil service positions. TriMet offers no authority, and the Court has found none, supporting TriMet's proposition. The term "civil service position" was not defined in the statute until 2010, but the fact that "civil service position" was not defined in the statute until 2010 does not mean that before that date it had the meaning attributed to it by TriMet.

Webster's Third New International Dictionary defines civil service as, among other things, "the whole body of public servants employed by a government other than those in the armed services." Webster's Third New International Dictionary 413 (3d ed. 2002). As discussed above, TriMet was a political subdivision of the state of Oregon for purposes of the Veteran's Preference Statute. And, as conceded by TriMet, mass transit districts are defined as a "unit of local government." O.R.S. § 267.200. Thus, TriMet is a branch of government other than the armed services, and its employees are therefore civil servants. Additionally, the text and context of the Veteran's Preference Statute, as amended in 2007, demonstrate that the amendment was intended to broaden the statute's reach beyond positions in which a civil service examination was given. Further, when "civil service position" was defined in the Veteran's Preference Statute, the legislature defined it broadly to encompass positions or promotions to positions for which the "decision is made or required to be made based on the results of a merit-based, competitive

---

[4] TriMet also argues that veteran's preference points were only required for civil service examinations and that TriMet does not use such examinations. This argument is irrelevant because it relates to the Veteran's Preference Statute as it existed before June 2007 and Davis does not allege that she was improperly denied veteran's preference points before June 2007. The statute was amended in June 2007 so that veteran's preference points were no longer only required for positions in which a civil service examination was given.

process that includes, but is not limited to, consideration of an applicant's or employee's relative ability, knowledge, experience and other skills" and that positions need not be labeled civil service positions to be considered civil service positions for purposes of the Veteran's Preference Statute. O.R.S. § 408.225(1)(a)(A)(B). The Court finds that TriMet has not demonstrated that its positions were not civil service positions as contemplated by the Veteran's Preference Statute.

### b.  Whether veteran's preference points had to be given at each stage of the hiring process during the relevant time period

After the 2007 amendment, the Veteran's Preference Statute established that preference shall be given to veterans as follows:

> (1) A public employer shall grant a preference to a veteran or disabled veteran who successfully completes an initial application screening or an application examination or who successfully completes a civil service test the employer administers to establish eligibility for a vacant civil service position. The employer shall grant the preference in the following manner:

> (a) For an initial application screening used to develop a list of persons for interviews, the employer shall add five preference points to a veteran's score and 10 preference points to a disabled veteran's score.

> (b) For an application examination, given after the initial application screening, that results in a score, the employer shall add preference points to the total combined examination score without allocating the points to any single feature or part of the examination. The employer shall add five preference points to a veteran's score and 10 preference points to a disabled veteran's score.

> (c) For an application examination that consists of an interview, an evaluation of the veteran's performance, experience or training, a supervisor's rating or any other method of ranking an applicant that does not result in a score, the employer shall give a preference to the veteran or disabled veteran. An employer that uses an application examination of the type described in this paragraph shall devise and apply methods by which the employer gives special consideration in the employer's hiring decision to veterans and disabled veterans.

*former* O.R.S. § 408.230(1) (2007).[5]

TriMet argues that the Veteran's Preference Statute requires preference be given at only one stage in the hiring process because of Section (1)'s use of the phrases "a preference" and "the preference," use of the word "or" between the types of preference to be given, and requirement that a candidate "successfully" complete an application or an application screening.

The Court disagrees with TriMet's reliance on the use of "or" as establishing that only a single preference need be given. The use of "or" merely establishes that preference must be given if any of the listed conditions are met, as opposed to the use of "and," which would require that all of the listed conditions must be met before any veteran's preference be given. That would be an illogical reading of the statute and inconsistent with the text and context of the statute. The listed conditions may be mutually exclusive. Additionally, one of the listed conditions is the taking of a civil service test, and it is clear from the text and context of the 2007 amendment to the statute that it was intended to expand the reach of the statute beyond positions for which a civil service test is required. Thus, if the legislature had used "and" instead of "or" in the 2007 amendment, the statute would only reach positions for which there was a civil service test given, plus an application examination, plus an initial application screening, which would have made the statute applicable to fewer positions than it was before it was amended. The Court rejects the contention that the use of "or" in Section (1) necessarily requires that the employer give veteran's preference at only one stage of the hiring process.

The Court also does not interpret the requirement in Section (1) that a candidate "successfully" complete an initial screening or application examination as requiring that the

---

[5] The Veteran's Preference Statute was amended in 2011, effective May 19, 2011, which is the current version of the statute. This amendment reorganized the subsections, but is not substantively different.

preference only be given at one phase in the hiring process. The statute continues in subsections (1)(a)-(c) by explaining how the preference points are given at each stage of the hiring process. The logical meaning of the requirement that a candidate "successfully" complete the phases, in light of the text and context of the statute, is that after a candidate applies for a position, if the candidate meets the minimum qualifications and would be considered to move forward in the application process, the candidate is to be given the preference points at the initial phase to see if the candidate scores highly enough to move on to the next phase. If the candidate does not meet the minimum qualifications and would not be considered to move forward in the application process, the candidate has not "successfully" applied for the position and no preference points need be given. The statute's requirement that a candidate "successfully" complete a particular phase does not support TriMet's argument that veteran's preference points need only be given at one phase in the hiring process.

Finally, the use of "a preference" and "the preference" may mean that only one preference be given throughout the hiring process, or it may mean that only one preference be given at each stage of the hiring process. Notably, after using "the preference" and "a preference," the Veteran's Preference Statute continues by describing how preference must be given at three different phases of the hiring process. The text of the statute does not conclusively establish that an employer may choose only one of the three listed stages of the hiring process in which to give veteran's preference, and need not give preference at any other stage. If the Oregon legislature intended that the benefits of a veteran's preference be given at only one stage and that an employer could choose which stage to give the preference, the legislature could have, and likely would have, said so more clearly.

PAGE 13 – OPINION AND ORDER

Although the Court does not interpret the Veteran's Preference Statute as unambiguously establishing that only one preference need be given during hiring process, the statute also does not unambiguously establish that a preference need be given at each stage of the hiring process. There is an Oregon Administrative Rule promulgated by Oregon's Bureau of Labor and Industries ("BOLI"), however, that unambiguously states that veteran's preference points must be given at each stage. The relevant rule explains that "[*a*]*t each stage* of the application process a public employer will grant a preference to a veteran . . . ." *Former* Or. Admin. R. 839-006-0450 (2010) (emphasis added).[6] TriMet argues that this rule is not a proper interpretation of the Veteran's Preference Statute and does not comport with the statutory text.

When disputed statutory text is part of a regulatory scheme to be administered by an administrative agency, a court must first determine whether the disputed text is "exact," "inexact," or "delegative." *Blachana, LLC v. Bureau of Labor and Indus.*, 354 Or. 676, 687 (2014) (citing *Springfield Educ. Ass'n v. Sch. Dist.*, 290 Or. 217, 223 (1980)). These terms are described by the Oregon Supreme Court as:

> "Exact" terms are terms of precise meaning. "Inexact" terms communicate a complete policy statement, but the words used may be imprecise, requiring further interpretation. Finally, "delegative" terms require the agency to make policy determinations in the first instance.

*Id.* (citations omitted). The Court finds that the text of the statute describing the preference to be given is "inexact." It embodies a complete legislative policy, but is not so precise as to be an "exact" term—the words are capable of more than one meaning. Inexact text is reviewed by a court as a matter of law. *Edwards v. Riverdale Sch. Dist.*, 220 Or. App. 509, 513 (2008).

---

[6] The 2011 and current versions of the rule also require that preference be given to veterans "[*a*]*t each stage* of the application process." *See former* Or. Admin. R. 839-006-0450(1) (2011) (emphasis added); Or. Admin. R. 839-006-0450(2) (2014) (emphasis added).

The Court thus must review BOLI's interpretation expressed in Or. Admin. R. 839-006-0450 (2010) "to ensure that it is consistent with the legislature's intent." *Blachana*, 354 Or. at 687; *Springfield*, 290 Or. at 228. "The dispositive question of law . . . is whether the agency action is within the legislative policy which inheres in the statutory term." *Springfield*, 290 Or. at 227. BOLI's interpretation is not entitled to deference per se, *Blachana*, 354 Or. at 687, but "may be given an appropriate degree of assumptive validity if the agency was involved in the legislative process or if [the court] infer[s] that [the agency] has expertise based upon qualifications of its personnel or because of its experience in the application of the statute to varying facts." *Springfield*, 290 Or. at 227-28.

The Court finds that BOLI has a level of expertise and experience that warrants giving Or. Admin. R. 839-006-0450 a degree of assumptive validity. The Veteran's Preference Statute establishes that failure to give veteran's appropriate deference is an unlawful employment practice and that an aggrieved veteran may file a complaint with BOLI. *See former* O.R.S. § 408.230(7) (2010). The text and context of the statute is consistent with BOLI's interpretation. The Court also notes that the summary of Senate Bill 822, as introduced, which is the amendment to the Veteran's Preference Statute in 2007 expanding the statute's reach, notes that the amendment to the statute "[p]ermits [a] veteran or disabled veteran to use preference more than once." Accordingly, the Court finds that BOLI's interpretation is consistent with the legislature's intent in expanding the statute.

TriMet argues that Or. Admin. R. 839-006-0450 is not instructive because it does not apply to the positions applied to by Davis. TriMet argues that instead Or. Admin. R. 839-006-0455, as in effect in 2009, applies. This rule stated, in relevant part, that

> (1) A public employer will grant a preference to a person seeking
> promotion and who is employed by the public employer in a

permanent civil service position only if the person:

(a) Was granted military leave by the public employer to serve in the Armed Forces of the United States;

(b) Returned from the military leave to the civil service position;

(c) Qualified as a veteran or disabled veteran, as defined in OAR 839-006-0440(5) and (2), by reasons of the person's service during the military leave or otherwise;

(d) Successfully completed a test or examination for the promotional position; and

(e) Meets the minimum qualifications and any special qualifications for the promotional position.

*Former* Or. Admin. R. 839-006-0455 (2009). This rule was amended in 2012 and currently states that "[a] public employer will grant a preference to a person seeking a promotion in the manner described at OAR 839-006-0450."

TriMet's argument that the previous version of the rule establishes that Davis was not entitled to veteran's preference points is unavailing. The language of the rule is ambiguous as to what a "promotion" is—it could mean seeking a promotional title or salary increase versus applying for a vacant position that would be considered a promotion. To the extent the rule was meant to encompass the latter, such as the positions to which Davis applied, it is contrary to the text of the Veteran's Preference Statute, which expressly establishes the statute is applicable to any vacant civil service position. The text of the rule does not supersede the statutory language that renders the Veteran's Preference Statute applicable to an existing employee applying for a vacant position. *See Blachana*, 354 Or. at 687.

Moreover, Davis served in the military before she began working at TriMet and did not seek leave from TriMet to serve in the military, as is required under *former* Or. Admin. R. 839-006-0455(1)(a). To the extent the rule was intended to establish that persons applying for

PAGE 16 – OPINION AND ORDER

promotional positions who served in the military before beginning work for the public employer are not entitled to veteran's preference but persons who were granted leave from the public employer and returned to the same job and then applied for a promotional position are entitled to veteran's preference, such an interpretation by BOLI would be contrary to the legislative intent of the Veteran's Preference Statute and is rejected. *Blachana*, 354 Or. at 687. The Court's rejection of this interpretation is supported by the fact that Or. Admin. R. 839-006-0445 in effect in 2009 established that a veteran is eligible for preference for any application within 15 years of discharge, and that for disabled veterans, there is no time limit on the application of the preference. *Former* Or. Admin. R. 839-006-0445 (2009). It is also supported by the fact that in 2012, rule 839-006-0455 was changed to clarify that applications for promotions are not treated differently under the Veteran's Preference Statute.

The Court interprets the Veteran's Preference Statute as requiring that a preference be given at both the initial screening phase and the next phase, the "application examination." The Court also finds that the Veteran's Preference Statute applied to the positions to which Davis applied throughout the relevant time period.

### 2.  Davis's claims relating to the jobs to which she applied before January 1, 2010

Between June 20, 2007 and January 1, 2010, Davis unsuccessfully applied for several positions at TriMet. Without specifying precisely which positions are at issue in this claim, Davis asserts generally that TriMet failed to award her all of the veteran's preference points to which she was entitled under the Veteran's Preference Statute. TriMet admits that it did not give Davis veteran's preference points before January 1, 2010, but argues that because it was not a public employer under the statute, the Veteran's Preference Statute did not apply to TriMet before that date.

PAGE 17 – OPINION AND ORDER

The Court has held that TriMet was a public employer under the Veteran's Preference Statute as that term was defined before the January 1, 2010 amendment. Because TriMet, under the facts of this case, was subject to the Veteran's Preference Statute after June 2007 and admits that it did not begin to give Davis any veteran's preference points until January 1, 2010, there is an issue of fact as to whether, if Davis had received the veteran's preference points to which she was entitled for the positions she applied to before January 1, 2010, she would have received the applied-for job or jobs.

### 3.  Davis's claims relating to the jobs to which she applied after January 1, 2010

TriMet agrees that it was subject to the Veteran's Preference Statute after January 1, 2010, but argues that it properly applied the required veteran's preference points. The evidence submitted by TriMet shows that it applied ten veteran's preference points to Davis's application, which would comply with the Veteran's Preference statute if TriMet had only one hiring phase.

### a.  Whether TriMet has only one hiring phase

TriMet argues that its hiring only had one phase. Davis responds that TriMet's hiring process encompassed two phases—an initial application screening process and an "application examination" that consisted of an interview. To determine whether Trimet had an "application examination" phase, the Court interprets what is encompassed by the term "application examination" in the Veteran's Preference Statute. Subsection (1)(b) of the Veteran's Preference Statute in effect at the relevant time, which involves scored "application examinations," does not define "application examination." Subsection (1)(c), however, which involves unscored "application examinations" does provide examples of what the term "application examination" is meant to encompass for purposes of the Veteran's Preference Statute. The term has a broad meaning for purposes of the statute and includes interviews, an evaluation of a veteran's

performance, experience, or training, a supervisor's rating, or other methods of ranking an applicant. *Former* O.R.S. § 408.230(1)(c) (2010).

The evidence in this case shows that TriMet's initial application screening process includes scores for some combination of education, experience, computer skills, attendance, performance and discipline, or supplemental questions. Those scores are added together to reach a subtotal. The top scorers from this subtotal are then given interviews, which are also scored, and the combined top scorer is offered the position. The Court, therefore, finds that TriMet has two phases in its hiring process—the initial screening phase which reduces the applicant pool to only a select few who move on to the interview phase, which is the "application examination" phase. TriMet provided Davis with the required ten veteran's preference points during the initial screening phase. TriMet did not, however, provide any veteran's preference points during the "application examination" phase, *i.e.*, the interview.

### b. Application of veteran's preference for post-January 1, 2010 positions

For two of the post-January 1, 2010 positions to which Davis applied, application of the ten veteran's preference points at the "application examination" stage would not have made her the top-scoring candidate. For one position, however, the Assistant Manager, Field Operations, the application of the ten veteran's preference points in addition to an adjustment of Davis's score of zero based on attendance issues that may have been related to her disability, on-the-job injury, or protected leave (discussed further below), would have made Davis the second highest-scoring candidate.[7] The person with the highest score declined the position and the position was

---

[7] For example, if Davis had been given a score of "four" on the attendance criteria, the same as the attendance score she was given for the Assistant Manager, Rail Transportation position to which she applied in early 2011, she would have obtained the second-highest score if also given the veteran's preference points. Although TriMet's alleged violation in failing to provide Davis with the appropriate veteran's preference points and improperly penalizing Davis for her absences, independently, may not have resulted in the loss of this position, TriMet cannot

then given to the candidate with the second-highest score. Thus, there is an issue of fact as to whether TriMet's failure to provide Davis with the required veteran's preference points resulted in a loss of a position to which she otherwise would have been entitled.

Additionally, the Court may order injunctive or other equitable relief, and reasonable attorney's fees and costs, to a plaintiff who prevails on a claim brought under the Veteran's Preference Statute. O.R.S. 659A.855(1)-(2).[8] Thus, even if Davis would not have been awarded any position but for TriMet's alleged violations of the Veteran's Preference Statute, Davis may still seek other relief for TriMet's alleged violations, which include TriMet's alleged failure to provide the necessary preference points as required under O.R.S. § 408.230(1)-(2) and TriMet's alleged failure to provide to Davis in writing the reasons for the decision not to appoint Davis to positions to which she applied, in violation of O.R.S. § 408.230(5).

### 4. Conclusion

TriMet's motion for summary judgment on Davis's claim that TriMet violated O.R.S. § 408.230 is denied with respect to positions for which Davis applied after June 2007.

### B. Second Claim for Relief—Injured Worker Discrimination and Retaliation

Davis alleges that TriMet discriminated and retaliated against her for invoking the worker's compensation system by sending her "time loss" letters that were disciplinary in nature and counting time she missed at work as a result of her on-the-job injury against her when considering her for promotion, in violation of O.R.S. § 649A.040. This statute provides:

---

escape liability by violating multiple statutes that only cumulatively result in the loss of a promotion.

[8] The Court notes that Davis's claims under the Veteran's Preference Statute are to be tried by the Court, and not a jury. O.R.S. § 659A.855. Because the effect of TriMet's failure to give Davis the required veteran's preference for the Assistant Manager, Field Operations position depends on whether Davis's score of zero for attendance is found wrongful by the jury, this claim will be tried after the jury trial on Davis's other remaining claims.

> It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws.

O.R.S. § 649A.040(1). Although O.R.S. § 659A.040 mentions only "discrimination," courts have analyzed claims under the statute as claims for "retaliation" or "discriminatory retaliation." *See Anderson v. Hibu, Inc.*, --- F. Supp. 2d ----, 2014 WL 2619641 (D. Or. June 12, 2014); *Dunlap v. Liberty Nat'l Prods., Inc.*, 2013 WL 6177855 (D. Or. Nov. 25, 2013); *Herbert v. Altimeter, Inc.*, 230 Or. App. 715 (2009); *Elek v. Safeway, Inc.*, 2009 WL 483186 (D. Or. Feb. 25, 2009); *Williams v. Home Depot U.S.A., Inc.*, 2006 WL 1005076 (D. Or. April 13, 2006); *Kirkwood v. Western Hyway Oil Co.*, 204 Or. App. 287 (2006); *Granville v. City of Portland*, 2005 WL 1113841 (D. Or. May 10, 2005).

To establish a *prima facie* case for worker's compensation discrimination under O.R.S. § 659A.040, Davis must show the following elements: (1) Davis invoked the worker's compensation system, (2) TriMet discriminated or retaliated against Davis in hiring or the tenure, terms, or conditions of Davis's employment, and (3) TriMet discriminated or retaliated against Davis because she invoked of the worker's compensation system. *Williams v. Freightliner, LLC*, 196 Or. App. 83, 90 (2004). The amount of evidence necessary to establish a *prima facie* case is "minimal." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000).

The parties do not dispute that the first element of O.R.S. § 659A.040 is satisfied, but TriMet disputes whether Davis met her *prima facie* burden for the second and third elements. The Court applies the burden shifting framework established in *McDonnell Douglas Corp. v. Green*,[9] to claims brought under O.R.S. § 659A.040. *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237

---

[9] 411 U.S. 792, 802-04 (1973).

F.3d 1080, 1090-94 (9th Cir. 2001); *Dunlap*, 2013 WL 6177855, at *9. Under *McDonnell*

*Douglas*, after a plaintiff proves a *prima facie* case of retaliation, the employer must present

evidence of a legitimate, non-retaliatory reason for the adverse action. *Snead*, 237 F.3d at 1093-

94. If the employer successfully carries this burden, then the plaintiff must show that the non-

retaliatory reason given by the employer was merely pretext for discrimination. *Id.*

### 1. Whether TriMet discriminated or retaliated against Davis in hiring or the tenure, terms, or conditions of Davis's employment

Davis argues that the second element of a claim under O.R.S. § 659A.040 is satisfied by

the time loss letters TriMet sent Davis warning her that she was in violation of TriMet's

attendance policy and by TriMet's refusal to hire or promote Davis into a managerial position.

She contends that she was not hired or promoted into that position based, at least in part, on an

attendance score of "zero" that resulted from time she missed at work due to her on-the-job

injury. TriMet responds that the time loss letters do not constitute adverse employment actions

because they did not affect the tenure, terms, or conditions of Davis's employment with TriMet.

Although TriMet disputes its reason for not hiring or promoting Davis into managerial positions,

it does not dispute that it did not do so.

The parties dispute whether the second element of a claim under O.R.S. § 659A.040

requires an employment action that affects the terms and conditions of employment, or whether

an employment action that would deter or dissuade a reasonable employee from exercising his or

her rights under O.R.S. 659A.040 suffices. This dispute tracks the distinction between what

constitutes an "adverse employment action" under an "antidiscrimination" statutory provision

versus an "antiretaliation" provision.

In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the United

States Supreme Court analyzed what constitutes an adverse employment action in the context of

Title VII of the Civil Rights Act of 1964's antidiscrimination and antiretaliation provisions, 42

U.S.C. §§ 2000e-2 to -3 ("Title VII"). The Supreme Court distinguished between the scope of

Title VII's antidiscrimination and antiretaliation provisions based on their respective texts. The

antidiscrimination provision makes it unlawful to

> fail or refuse to hire or to discharge . . . or otherwise to discriminate against any
> individual with respect to his compensation, terms, conditions, or privileges of
> employment, because of such individual's race, color, religion, sex, or national
> origin; or (2) to limit, segregate, or classify . . . employees or applicants for
> employment in any way which would deprive or tend to deprive any individual of
> employment opportunities or otherwise adversely affect his status as an employee,
> because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). The antiretaliation provision, in contrast, makes it unlawful to

> discriminate against . . . any individual . . . because he has opposed any practice
> made an unlawful employment practice by this subchapter, or because he has
> made a charge, testified, assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this subchapter.

*Id.* § 2000e-3(a).

The Supreme Court noted that the text of the antidiscrimination provision "explicitly

limit[s] the scope of that provision to actions that affect employment or alter the conditions of the

workplace" whereas "[n]o such limiting words appear in the antiretaliation provision."

*Burlington*, 548 U.S. at 62. The Court held that for retaliation claims, an adverse employment

action need not affect the terms and conditions of employment, but is actionable if "a reasonable

employee would have found that challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Id.* at 68 (citation and quotation marks omitted).

The Supreme Court went on to discuss why this distinction was appropriate in light of the

differing purposes of the antidiscrimination and antiretaliation provisions of Title VII:

The antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status. The antiretaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct.

To secure the first objective, Congress did not need to prohibit anything other than employment-related discrimination. The substantive provision's basic objective of "equality of employment opportunities" and the elimination of practices that tend to bring about "stratified job environments," would be achieved were all employment-related discrimination miraculously eliminated.

But one cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace. Were all such actions and harms eliminated, the antiretaliation provision's objective would *not* be achieved. An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace. A provision limited to employment-related actions would not deter the many forms that effective retaliation can take. Hence, such a limited construction would fail to fully achieve the antiretaliation provision's "primary purpose," namely, "[m]aintaining unfettered access to statutory remedial mechanisms."

*Id.* at 63-64 (citations omitted) (emphasis and alterations in original).

O.R.S. § 659A.040 is substantively an antiretaliation statute, because it seeks to protect employees for what they do—their conduct in invoking or otherwise utilizing Oregon's worker's compensation system—and not for who they are. The purpose of the statute would appear to comport with the antiretaliation provision of Title VII, supporting the application of *Burlington's* broader definition of an adverse employment action for claims under O.R.S. 659A.040. The fact that the statute is substantively an antiretaliation statute, however, is not dispositive of the issue

of what constitutes actionable conduct by an employer under the statute. The Court must first review the text of the statute.

The text of O.R.S. § 659A.040 defining actionable employer conduct contains similar limitations as the text in the antidiscrimination provision of Title VII relied on by the Supreme Court in determining that the more narrow definition of an adverse employment action applies. O.R.S § 659A.040 provides that it is an unlawful employment action "to discriminate against a worker with respect to hire or tenure or any term or condition of employment." Thus, although the statute is substantively an antiretaliation statute, and, as noted above, courts have consistently analyzed claims brought under the statute as claims for retaliation, the Court is constrained by the text of the statute to accept as actionable only employment actions with respect to hiring, tenure, or a term or condition of employment. *See Willer v. Tri-Cnty. Metro. Transp. Dist.*, 2008 WL 3871744, at *7 (D. Or. Aug. 19, 2008) (holding that the text of the Oregon statute "limited the scope of actionable conduct under the anti-discrimination provision to acts that affect employment or alter the conditions of the workplace") (quotation marks and citation omitted).

This interpretation is supported by decisions of the Oregon Court of Appeals, which although not analyzing claims under O.R.S. § 659A.040 in terms of "adverse employment actions," have established as an element of a *prima facie* claim that a plaintiff must show that he or she "was discriminated against in the tenure, terms, or conditions of employment." *See, e.g.*, *Williams*, 196 Or. App. at 90. Davis points to no Oregon state court case, and the Court could find none, where an alleged action by an employer in a claim under O.R.S. § 659A.040 was analyzed using the broader "retaliation" definition of an adverse employment action, *i.e.*, whether the alleged action would have dissuaded a reasonable employee from invoking Oregon's worker's compensation system.

There have been cases before this Court that have analyzed alleged adverse employment actions in cases brought under O.R.S. § 659A.040 using the broader retaliation definition of an adverse employment action. *See, e.g.*, *Anderson*, 2014 WL 2619641, at *4; *Elek*, 2009 WL 4831386, at *2. Those cases, however, did not address the specific text of O.R.S. § 659A.040 that expressly limits actionable employer conduct to conduct affecting hiring, tenure, or other terms and conditions of employment (analogous to the "discrimination" definition of an adverse employment action).

The time loss letters discussed the possibility of putting Davis on an absentee plan or other repercussions, but those possibilities did not come to pass. There is no evidence that the terms or conditions of Davis's employment were affected by the absentee letters. Thus, they are not actionable under O.R.S. § 659A.040.

TriMet's refusal to hire or promote Davis into managerial positions, however, amounts to potentially actionable discrimination under O.R.S. § 659A.040. "Refusal to hire or promote" an employee because the employee invoked the worker's compensation system is considered an unlawful employment action under O.R.S. § 659A.040. Or. Admin. R. 839-006-0117. The evidence in the record shows that Davis applied for multiple managerial positions with TriMet after filing her worker's compensation claim and was not hired or promoted into any of them. The evidence also shows that for the position of Assistant Manager, Field Operations, Davis was given an attendance score of zero. Thus, Davis meets her burden of showing that the second element of a claim under O.R.S. § 659A.040 has been met with respect to TriMet's failure to promote her.

### 2. Whether the alleged discriminatory acts were "because of" Davis's use of the worker's compensation system

To meet the third element, Davis must show that the alleged discriminatory and retaliatory actions against her were taken because she invoked the worker's compensation system. In other words, she must show that her invocation "of the workers' compensation system was a substantial factor in [TriMet's]" alleged adverse actions. *Herbert*, 230 Or. App. at 726; *see also Anderson*, 2014 WL 2619641, at *5. "[T]o be a substantial factor, the employer's wrongful purpose must have been 'a factor that made a difference' in the [adverse employment action]." *Estes v. Lewis & Clark Coll.*, 152 Or. App. 372, 381 (1998) (quoting *Nelson v. Emerald People's Util. Dist.*, 116 Or. App. 366, 373 (1992), *aff'd in part, rev'd in part*, 318 Or. 99 (1993)).

The degree of proof necessary to establish a *prima facie* case of a causal link on summary judgment is "minimal" and a plaintiff need only prove an inference of discrimination. *Snead*, 237 F.3d at 1089-91. Thus, a causal connection can be established either (1) "*indirectly*, by showing that the protected activity was followed closely by discriminatory treatment," or (2) "*directly*, through evidence of retaliatory animus directed against a plaintiff by the defendant." *Boynton–Burns v. Univ. of Or.*, 197 Or. App. 373, 380 (2005) (emphasis in original).

Davis was injured on the job on August 13, 2009. On November 19, 2009, her worker's compensation claim was closed, and TriMet issued her a partial denial of her claim. Davis continued to be absent from work after the closure of her worker's compensation claim and disputed the partial denial of her claim. An administrative law judge ("ALJ") found TriMet's partial denial of Davis's claim to be procedurally invalid and TriMet has continued to litigate that decision until as recently as January 2014, when the Oregon Court of Appeals upheld the ALJ's determination.

Davis also submitted evidence that her ongoing problem with her lumbar spine is a result of her on-the-job injury and, thus, her continued absences caused by that medical issue were related to her on-the-job injury. Davis is currently litigating the accepted conditions of her worker's compensation claim in an attempt to have her lumbar spine issues added to the claim. Thus, although her worker's compensation claim was only open from August 13, 2009, to November 19, 2009, Davis and TriMet continue to litigate Davis's worker's compensation claim through the worker's compensation system.

The evidence supports an inference that giving Davis a score of "zero" for attendance during the hiring process relating to the position of Assistant Manager, Field Operations, for which she applied in September 2010 was because of her invocation of the worker's compensation system. The record does not show what absences were considered in giving her the score of zero and whether the absences relating to her worker's compensation claim were considered. Further, it is disputed whether her other absences, not considered by TriMet to be caused by her on-the-job injury, were, in fact, caused by her on-the-job injury, rendering all of her absences for which points were detracted from her score to be related to her worker's compensation injury. These are issues for the fact-finder to determine. The attendance score of "zero" is sufficient evidence of causation regarding Davis's failure to be promoted to the position of Assistant Manager, Field Operations to meet her minimal *prima facie* burden.[10]

---

[10] As discussed above, when addressing Davis's claims under the Veteran's Preference Statute, the cumulative effect of Davis's score of zero for her absences and TriMet's alleged violation of the Veteran's Preference Statute resulted in Davis not receiving the second-highest score for the Assistant Manager, Field Operations position, which ultimately was given to the person with the second highest score.

### 3.  TriMet's assertion of a legitimate non-discriminatory reason for its conduct

TriMet does not offer any explanation for why giving Davis a score of zero for attendance in the application process for the Assistant Manager, Field Operations was not a violation of O.R.S. 659A.040. There is no evidence in the record that Davis's absences as a result of her workplace injury were not considered. Thus, TriMet fails to rebut Davis's *prima facie* case regarding this alleged adverse employment action.[11]

### 4.  Conclusion

Because TriMet did not rebut Davis's *prima facie* case for worker's compensation discrimination and retaliation under O.R.S. § 659A.040 based on the adverse employment action of giving Davis a score of "zero" during the application process for the Assistant Manager, Field Operations position, TriMet's motion for summary judgment is denied with respect to this alleged adverse employment action. TriMet's motion for summary judgment against Davis's claims under O.R.S. § 659A.040 is granted with respect to all other alleged adverse employment actions.

---

[11] In arguing issues relating to Davis's allegations of race and disability discrimination, TriMet argues that other, better qualified candidates were hired instead of Davis and that this is a legitimate, non-discriminatory reason not to promote her. To the extent TriMet intended to make a similar argument with respect to Davis's worker's compensation discrimination and retaliation claim based on the score of zero she received in the hiring process of the Assistant Manager, Field Operations, it is rejected. As previously discussed, the score of zero for attendance may have been outcome determinative, and TriMet offers no evidence or explanation for why it gave Davis that score of zero or how the score was not a result of Davis's invocation of the worker's compensation system. The Court further notes that Davis scored above zero for attendance for the other positions to which she applied, even though her attendance was an ongoing issue. The position for which she did score zero was the first position to which she applied after filing her worker's compensation claim, which is further evidence from which it could be inferred that any legitimate, non-discriminatory reason that may be offered by TriMet for Davis's score of zero is pretextual. Ultimately, these are matters for the fact-finder at trial.

**C.  Third Claim for Relief—Failure to Reemploy**

In order to state a *prima facie* case of failure to reemploy under O.R.S. § 659A.046, an employee must show that (1) the employee suffered a compensable on-the-job injury, (2) the employee was disabled from performing the duties of her former position, (3) the employee made a timely demand for reemployment, (4) at the time of that demand a suitable position was available, and (5) the employer failed to reemploy the employee in the available suitable position. O.R.S. § 659A.046. The parties do not dispute that the first element is satisfied by Davis's on-the-job injury that occurred on August 13, 2009. The remaining elements are discussed in turn.

To preserve her right to reemployment, an eligible employee must make a demand for reemployment within seven days of receipt of notice that a doctor has cleared the employee to return to work from her employer's insurer. § 659A.046(3)(e). If no suitable position is available at the time of a timely demand for reemployment, it is the employer's ongoing responsibility to alert an injured employee to the availability of a suitable position. Unless another condition specified in § 659A.046(3)(a)-(f) occurs, an employee's right to reemployment terminates three years after the date of her compensable injury; in this case, that date is August 13, 2012. § 659A.046(3)(f).

An available position is one that is vacant. A suitable position is "one that is most similar to the former position in compensation, duties, responsibilities, skills, location, duration . . . and shift" and it must "meet[ ] the injured worker's medical restrictions." Or. Admin. R. 839-006-0145(4). An employee's right to reemployment is also subject to any seniority provisions and other employment restrictions contained in a valid bargaining agreement. O.R.S. § 659A.046(4). An employer is neither required to nor prohibited from reemploying an injured employee in a position that would be a promotion. Or. Admin. R. 839-006-0145(5).

### 1.  Disabled from performing the duties of former position

TriMet argues that because the medical evidence available at the time indicated that Davis's restrictions due to her on-the-job injury had resolved and any inability to perform the functions of her former position were due to a preexisting condition, it only had a duty to reinstate Davis to her former position under O.R.S. § 659A.043, not to reemploy her in a different position under O.R.S. § 659A.046. Davis responds that the medical opinions of Dr. Hokansan, Dr. Puziss, and Dr. Tester, obtained after the closure of her worker's compensation claim, establish that her ongoing restrictions were, in fact, due to her on-the-job injury. Thus, although the parties agree that Davis suffered a compensable injury on August 13, 2009, the scope of that injury and its concomitant restrictions on Davis's ability to perform her job functions are disputed.

The issue before the Court on this element is whether the facts that gave rise to Davis's workplace injury are sufficient to permit a reasonable inference that the workplace injury resulted in the lumbar spine injuries as claimed by Davis, and, thus, limited her from performing the essential duties of her job. *See Petock v. Asante*, 351 Or. 408, 422 (2011). Summary judgment is appropriate only if the facts show that "no reasonable juror" could find that Davis's workplace injury caused the harm that she alleges. *Id.* "[A]n injured worker need not establish in a workers' compensation proceeding that he or she suffered a compensable injury before bringing a reinstatement" or reemployment claim. *Id.* at 423. In fact, a plaintiff can separately bring a reinstatement or reemployment claim and need not bring any worker's compensation benefit claim. *See id.*; *Armstrong v. Fed. Credit Un.*, 328 Or. 154, 162-63 (1998).[12]

---

[12] The Oregon Supreme Court has expressly reserved deciding whether a *final* determination in a worker's compensation proceeding would have a preclusive effect. The Workers Compensation Board closed Davis's claim on September 20, 2012, holding that TriMet had no obligation to reopen Davis's claim in the absence of a compensable aggravation or new or

Here, Davis submits evidence from Dr. Puziss, in which he opines that Davis's workplace injury of August 13, 2009 caused a herniated disc that was not properly diagnosed by her doctors at that time. Dr. Puziss further opines that:

> My medical opinion is that [Davis] has right lumbosacral facet syndrome; an aggravation of L4-5 pre-existing degenerative disc disease; a herniated disc at L4-5; and an annular tear at L4-5 with discogenic pain [that] were caused by the on the job injury of August 13, 2009. These conditions did not preexist the on the job injury the herniated disc, caused by the workplace injury, and that this caused her lumbar spine injuries.
>
> * * *
>
> The conditions that caused a period of inability to pursue her regular work included the annular tear of the L4-5 herniated disc and right lumbosacral facet syndrome.

Declaration of Dr. Paul Puziss ¶¶ 52, 55. This is evidence from which a reasonable jury could find that Davis's workplace injury caused the spinal injuries that resulted in Davis being unable to perform her regular job and, thus, triggering the reemployment requirements of O.R.S. § 659A.046.

## 2. Timely Demand for Reemployment

TriMet argues that Davis has not presented any evidence that she made a timely demand for reinstatement. A demand is timely if it is made within seven days of a doctor's clearing the employee to work under certain conditions. TriMet's argument is not well taken.

The Notice of Closure of Davis's claim was sent on November 19, 2009, and TriMet determined that Davis was no longer entitled to light duty work. TriMet instructed Davis to no

---

omitted medical condition. In February 2013, however, Davis filed a worker's compensation claim based on the medical evidence from Dr. Puziss seeking to add her lumbar spine issues, including the herniated disc, to her previously accepted claim for her August 2009 workplace injury. Because the decision on that claim is currently under appeal, the worker's compensation proceedings regarding Davis's lumbar spine issues are still ongoing and the Court need not reach the issue of preclusion. *Petock*, 351 Or. at 424 n.14.

PAGE 32 – OPINION AND ORDER

longer fill out light duty time sheets and to report to her regular maintenance supervisor. On November 20, 2009, Davis sent an email to Robert Brooks, her maintenance supervisor, stating that she would begin reporting to him again and alerting him that she was still under medical restrictions. This demand was timely.

On December 1, 2009, Davis had a doctor's appointment and that same day she met with Mr. Nielsen and provided him with the medical restrictions required by Davis's doctor. On December 28, 2009, Davis's primary care physician wrote a letter to TriMet regarding Davis's condition and restrictions and requested accommodations on behalf of Davis as a result of Davis's medical restrictions. Davis delivered this letter to Mr. Nielsen that same day. Davis received similar doctor's notes over the next several months and either emailed or met with TriMet within days of each doctor's note discussing Davis's medical restrictions. All of these demands were also timely. Davis meets her burden to demonstrate that there is an issue of fact as to whether she timely made demands for positions suitable for her medical restrictions.

### 3.  Available suitable position

TriMet admits that it placed Davis in "light duty" temporary positions during the time that her worker's compensation claim was open. These positions are temporary positions that are offered to TriMet employees during the pendency of the employee's worker's compensation claim. An employee is eligible for a maximum of 60 days of "light duty" employment. After a claim is closed, the employee is no longer eligible for "light duty" positions. Based on this "light duty" policy, once Davis's worker's compensation claim was closed on November 19, 2009, TriMet no longer considered her eligible for light duty temporary positions and did not consider her for any such positions that may have been available.

TriMet argues on summary judgment that Davis cannot show that there were any suitable positions available at TriMet after Davis's worker's compensation claim was closed on

PAGE 33 – OPINION AND ORDER

November 19, 2009, and Davis was no longer eligible for TriMet's light duty program. TriMet also argues that it could not have placed Davis in a suitable position because of the labor agreement, which requires that an employee bid for a position and that seniority be considered.

Davis responds that TriMet could have placed Davis in the light duty positions of bundling transfers, park and ride, and spotter shack during the statutory reemployment time period. She offers no evidence, however, that these positions were actually available from November 20, 2009 through August 12, 2012. Moreover, during the pendency of Davis's worker's compensation claim, TriMet attempted to place her in the light duty position of park and ride, and Davis's doctor determined that the duties of that position were outside of her medical restrictions and thus, that position was not suitable.

Davis's argument also conflates a "light duty" position pursuant to TriMet's light duty policy and a "suitable" position for reemployment pursuant to O.R.S. § 659A.046. TriMet's light duty positions are temporary. Davis performed some of those positions for only a matter of days. A suitable position for reemployment is a replacement position for the position that the injured worker can no longer perform and the employee is "entitled to remain in the position, provided the worker's restrictions continue to allow the worker to perform the duties of the position and the position is not eliminated for bona fide reasons." Or. Admin. R. 839-006-0135(5). Temporary, light duty positions intended as a short-term measure to enable injured workers to work while recovering from an injury do not constitute suitable and available positions for reemployment. *See Kelly v. Ironwood Commc'ns., Inc.*, 2009 WL 1220567, at *7-8 (D. Or. Apr. 30, 2009). Additionally, placement in a suitable position is expressly subject to any seniority requirement or other provision of a labor agreement. O.R.S. § 659A.046(4). Davis offers no evidence of any non-temporary positions that were suitable for Davis and available.

Nor does she offer any evidence or argument as to how TriMet could place her in a position for more than two-and-a-half years without a bidding process as required under the labor agreement. Davis fails to meet her burden of demonstrating that there is an issue of fact as to whether TriMet had suitable positions available.

### 4.  Failure to reemploy

The parties do not dispute that to the extent Davis qualified for reemployment, made a timely demand for reemployment, and a suitable position was available, TriMet did not reemploy Davis in that position.

### 5.  Conclusion

Because Davis failed to provide evidence from which a reasonable juror could infer that there were any suitable and available positions, TriMet's motion for summary judgment is granted with respect to Davis's claim under O.R.S. 659A.046.

## D.  Fourth and Sixth Claims for Relief—Disability Discrimination

Davis's Fourth and Sixth Claims for Relief allege employment discrimination in violation of Oregon's Rehabilitation Act and the ADA, respectively (collectively, the "Disability Statutes"). The Disability Statutes prohibit discrimination on the basis of disability in hiring, advancement, compensation, or other terms and conditions of employment. *See* 42 U.S.C. § 12112(a) (prohibiting discrimination on the "basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment"); O.R.S. § 659A.112(1) ("It is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment on the basis of disability.").

To state a *prima facie* case of employment discrimination under § 12112, Davis must allege that (1) she is "disabled" as defined by the ADA, (2) she is a "qualified individual" as defined by the ADA, and (3) she suffered an adverse employment action on the basis of her disability. *See Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). The Oregon Rehabilitation Act is construed consistently with the ADA and the same elements are required. *See Snead*, 237 F.3d at 1087 ("The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law." (citing *Henderson v. Jantzen, Inc.*, 79 Or. App. 654, 657 (1986))); *see also Washburn v. Columbia Forest Prods., Inc.*, 340 Or. 469, 476-77 (2006); O.R.S. § 659A.139 ("ORS 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended.").

TriMet argues that Davis cannot meet the third element because she cannot show that she was subjected to an adverse employment action because of her disability. Davis responds that TriMet failed to engage in the interactive process to determine a reasonable accommodation as required under the Disability Statutes, that the time loss letters constitute adverse employment actions taken because of Davis's disability, and that TriMet's failure to promote Davis into managerial positions was because of her disability.

## 1. Interactive Process

After an employer becomes aware of an employee's disability, the employer and employee must engage in good faith in an interactive process to determine a reasonable accommodation. *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110 (9th Cir. 2010). This process "requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Id.*

PAGE 36 – OPINION AND ORDER

(quotation marks and citation omitted). "[E]mployers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *vacated on other grounds,* 535 U.S. 391 (2002). Good faith participation in the interactive process is a continuing obligation, and the failure of an attempted accommodation does not excuse an employer from further participation in the interactive process. *Humphrey v. Mem'l Hospital Ass'n,* 239 F.3d 1128 (9th Cir. 2001). "An employer is not obligated to provide an employee the accommodation he [or she] requests or prefers, the employer need only provide some reasonable accommodation." *UPS Supply Chain.* 620 F.3d at 1110-11.

Liability for failure to engage in the interactive process arises only if a reasonable accommodation would have been possible. *Barnett,* 228 F.3d at 1116. In the Ninth Circuit, an employee must show an adverse employment action before such liability may arise. *See Samper v. St. Vincent Med. Ctr.,* 675 F.3d 1233, 1237 (9th Cir. 2012); *Allen v. Pac. Bell,* 348 F.3d 1113, 1114 (9th Cir. 2003).

Here, after Davis's worker's compensation claim was closed and she was informed that she was no longer eligible for light duty work, on November 20, 2009, she requested that TriMet return her to work in a modified position. TriMet informed her that it would see if there were positions that she could perform with her restrictions and that otherwise she would need to use her sick time. There is little evidence of what, if anything, TriMet did at that time to see what positions were available or if accommodations could be made (such as scheduling an ergonomics assessment). Davis provided TriMet with doctor's releases setting forth her restrictions and otherwise communicated her need for modified work or other accommodation on December 1, 2009, December 28, 2009, January 25, 2010, February 2, 2010, and February 4, 2010. During

this time, Davis was off work and using her FMLA and OFLA leave time and all of her paid

vacation and sick time. On or about February 9, 2010, after Davis's protected leave expired,

TriMet held a meeting with Davis, Mr. Nielsen, Ms. Shipley, and Mr. Mathers regarding Davis's

return to work, accommodations (including an ergonomic assessment), and issues with the

calculation of her leave time.

On March 9, 2010, Davis received from her doctor another release to work, with

restrictions, as of March 23, 2010. Davis emailed Ms. Shipley and Mr. Nielsen requesting an

ergonomics assessment. TriMet had this assessment conducted and complied with all of the

requested accommodations except purchasing a lightweight impact tool. TriMet contends that an

electric impact tool is subject to TriMet's tool allowance policy set forth in the labor agreement,

which provides that journey level mechanics (such as Davis) receive certain sums added to their

hourly wage as a tool allowance to purchase "personal hand tools"[13] and that TriMet will supply

one set of metric tools.

The evidence shows that beginning in February 2010, TriMet engaged in the interactive

process with Davis to accommodate her disability. TriMet's failure to purchase the electric

impact tool is not evidence of its failure to engage in the interactive process with Davis. The

accommodations made by TriMet after the ergonomic assessment were reasonable.

Davis has, however, raised an issue of fact as to whether TriMet timely engaged in the

interactive process after Davis requested on November 20, 2009, December 1, 2009, and

December 28, 2009, that she be returned to modified work. The evidence does not show that

TriMet engaged in the interactive process with Davis to determine whether any accommodation

could be made until after Davis used all of her leave and vacation and sick time and was forced

---

[13] The rate as of December 1, 2009 was forty-five cents per hour.

to take some leave without pay. TriMet cites to evidence of its efforts to work with Davis's restrictions before her worker's compensation claim expired on November 19, 2009 and again beginning in February 2010. The record is void, however, of such interactive communications between November 20, 2009 and February 10, 2010.

Under the circumstances of this case, the fact that TriMet did not engage in the interactive process until after Davis used all of her sick and vacation time and took leave without pay, subjecting her to potential discipline and termination for absenteeism, constitutes an adverse employment action. *See Coleman v. City of Tucson*, 2008 WL 5134346, at *5 (D. Ariz. Dec. 5, 2008); *Ganley v. Cnty. of San Mateo*, 2007 WL 4554318, at *8 (N.D. Cal. Dec. 20, 2007). Although providing leave may be considered a reasonable accommodation, *see* Or. Admin. R. 839-006-0206(2)(f), TriMet was still required to directly communicate with Davis to explore possible reasonable accommodations. *UPS Supply Chain*, 620 F.3d at 1110.

TriMet also argues that it could not have conducted an ergonomics assessment or made other accommodations until Davis returned to work in March 2010. This argument is without merit. Davis's doctors released her to work in November and December 2009 and January 2010 with certain restrictions. TriMet failed to engage in the interactive process and discuss with Davis whether accommodations could be made to enable her to perform work with those restrictions until February 2010. Notably, TriMet was able to engage in the interactive process in February 2010, but fails to explain why it could not have done so in December 2009 or January 2010.

Davis also argues that TriMet failed to engage in the interactive process in 2011 and 2012 in response to additional requests by Davis. The Court has considered these requests and Davis's work status at both time periods and finds these arguments without merit.

PAGE 39 – OPINION AND ORDER

### 2. Time Loss Letters

For the same reasons the time loss letters do not constitute an adverse employment action for purposes of Davis's worker's compensation discrimination claim, they do not constitute adverse employment actions for purposes of Davis's claims for disability discrimination.

### 3. Failure to Promote

Davis alleges that TriMet failed to promote her to various positions to which she applied because of Davis's disability and the time she missed from work as a result of her disability. TriMet argues that it did not promote Davis because she was not the most qualified person for the various positions. As discussed above, for the Assistant Manager, Field Operations position, TriMet gave Davis an attendance score of zero, which is evidence from which a reasonable juror could infer that Davis was discriminated against because of her disability. Additionally, Davis submits evidence that on December 14, 2011, in a meeting between her and Mr. Talbot, Director of Operations at TriMet, Davis asked Mr. Talbot what is important and considered by TriMet in evaluating candidates for the Assistant Manager of Transportation position to which Davis had applied. Mr. Talbot wrote on a white board some job skills and then added "attendance" and "worker's compensation" to the list, which is also evidence from which a reasonable juror could infer that TriMet discriminated against Davis in the promotion process for her attendance issues, which arguably were related to her disability.

Further, the Court notes that after giving Davis a zero for attendance on the Assistant Manager, Field Operations scoring, Davis either received a score of "4" for attendance or attendance was no longer separately scored. In those subsequent scores, however, Davis consistently received very low scores for her interview, which is the subjective component of the application process. Davis scored well in the objective skills, but the subjective part of her scoring was significantly lower.

A number of courts have recognized that subjective decision-making allows for subtle biases or unconscious stereotyping to affect selection processes. *See, e.g.*, *Gonzalez–Rivera v. INS*, 22 F.3d 1441, 1450 (9th Cir. 1994) (noting that "racial stereotypes often infect our decision-making processes only subconsciously"); *EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1236 (9th Cir. 1984) (observing that some subjective selection processes "though harmless in appearance, may hide subconscious [discriminatory] attitudes"); *Lynn v. Regents of the Univ. of Cal.*, 656 F.2d 1337, 1342 & n. 5 (9th Cir. 1981) (where decision is "highly subjective" courts should "scrutinize attitudes and motivation" to determine if discriminatory stereotypes affected the selection process); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 321 (N.D. Cal. 1992) (finding that employer's failure to articulate and apply objective criteria reinforces unconscious prejudice); *cf.*, *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2565 (2011) (noting "the problem of subconscious stereotypes and prejudices" in "subjective decisionmaking" in the context of a disparate impact claim) (quotation marks omitted). Thus, although the evidence of alleged disability discrimination is not as direct as with the score of zero for attendance in the Assistant Manager, Field Operations position, under the circumstances presented in this case, the low scores for the subjective interview component is evidence that supports Davis's allegation that TriMet's purported legitimate non-discriminatory for its failure to promote Davis to the other positions is a pretext.

### 4. Conclusion

TriMet's motion for summary judgment on Davis's claim for disability discrimination is denied with respect to (1) TriMet's engagement in the interactive process from November 20, 2009 through February 10, 2010; and (2) TriMet's failure to promote Davis after August 13, 2009. TriMet's motion for summary judgment is granted with respect to all other alleged adverse employment actions.

### E.  Fifth Claim for Relief—Race Discrimination and Retaliation

Davis asserts a claim for racial discrimination and retaliation under O.R.S. § 659A.030.[14]

Davis states in her response brief that she has brought a racial discrimination claim based on the

theory of disparate impact. Davis, however, only pled a claim of racial discrimination in

TriMet's treatment of her individually. Davis did not challenge any employment practice used by

TriMet as having a disparate impact on persons based on race or allege that TriMet's practices

have a significant impact on a protected class or group and that Davis, as a member of that

protected group, was adversely affected.[15] Thus, Davis did not plead a claim for race

discrimination based on the theory of disparate impact, and the Court will not consider such a

claim in analyzing TriMet's motion for summary judgment. *See Bova v. City of Medford*, 262

Or. App. 29, 32 (2014) (holding trial court erred in allowing disparate impact theory to proceed

when only disparate treatment theory was pled).

### 1.  Discrimination based on race

Davis alleges that TriMet discriminated against Davis because of her race in violation of

O.R.S. § 659A.030 by "preventing [her] from being successful at her job, failing to provide

training to [her], failing to consider [her] for promotions or transfers, failing to promote [her],

failing to transfer [her] to a different position, and demoting [her]." First. Am. Compl. ¶ 154.

---

[14] In her brief in response to TriMet's motion for summary judgment, Davis asserts that she brings racial discrimination, retaliation and disparate impact claims under Title VII. Davis, however, did not plead any such claims in her First Amended Complaint.

[15] Under Oregon law, a plaintiff may prevail on a disparate impact claim if he or she proves, among other things, that (1) the employer "has a standard or policy that is applied equally"; (2) "[t]he standard or policy has the effect of screening out or otherwise affecting members of a protected class at a significantly higher rate than others who are not members of that protected class"; and (3) the plaintiff "is a member of the protected class adversely affected by the [employer's] standard or policy and has been harmed by the [employer's] application of the standard or policy." Or. Admin. R. 839–005–0010(2).

Section 659A.030 provides that it is an unlawful employment action for an employer, because of

a person's race, color, or national origin, among other things, to refuse to hire or bar or discharge

the individual from employment. O.R.S. § 659A.030(1)(a). It is also an unlawful employment

action for an employer to, because of race, color, or national origin, discriminate against the

individual in compensation or in the terms, conditions, or privileges of employment. O.R.S.

§ 659A.030(1)(b). The parties agree that claims brought under O.R.S. § 659A.030 are analyzed

under the same framework as claims brought under Title VII, including application of the

*McDonnell Douglas* burden shifting. *See Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th

Cir. 2011); *Henderson*, 79 Or. App. at 657.

### a. *Prima facie* **case**

To state a *prima facie* case for racial discrimination, Davis must show that (1) she is a

member of a protected class; (2) she was qualified for her position and the positions to which she

applied; (3) she experienced an adverse employment action; and (4) similarly situated individuals

outside [her] protected class were treated more favorably, or other circumstances surrounding the

adverse employment action give rise to an inference of discrimination. *Peterson v. Hewlett-

Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). The evidence required to establish a *prima facie*

case is minimal. *Snead*, 237 F.3d at 1089-91; *Chuang*, 225 F.3d at 1124.

Davis points to no specific evidence and makes no specific argument as to how TriMet

violated O.R.S. § 659A.030 by preventing her from being successful, failing to provide training,

failing to transfer her, or demoting her. Davis's response focuses only on her claims arising from

TriMet's failure to promote her. The record in this case is nearly 700 pages. Courts have "no

independent duty 'to scour the record in search of a genuine issue of triable fact,' and may 'rely

on the nonmoving party to identify with reasonable particularity the evidence that precludes

summary judgment.'" *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010)

PAGE 43 – OPINION AND ORDER

(quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)). Thus, the Court is "under no obligation to undertake a cumbersome review of the record on [Davis's] behalf" and summary judgment can be granted on this basis alone. *Id.*

That said, the Court did review the record in an attempt to ascertain the contours of Davis's racial discrimination claim and does not find that she has established a *prima facie* case on her racial discrimination claims based on anything other than TriMet's failure to promote her.

The Court finds that Davis has established a *prima facie* case with respect to her claim that TriMet discriminated against Davis because of her race in failing to promote her. Davis is a member of a protected class and was subject to the adverse employment action of not being hired for the managerial positions to which she applied. She has provided evidence that she was qualified for the positions to which she applied, and TriMet does not dispute that fact with respect to most of the positions. Rather, TriMet argues that other candidates were more qualified. The evidence does not show that other candidates were more qualified as a matter of law.

The evidence also shows that Caucasians were treated differently than Davis. Several Caucasians were promoted directly into managerial positions without an open application process and Davis was not, although she requested to be. Additionally, most of the open positions to which Davis applied were given to Caucasian applicants. Finally, Davis provides evidence that all of the managers who were demoted at the same time Davis was demonted were subsequently promoted back to management except for Davis and a homosexual female. This evidence suffices to meet Davis's minimal burden to establish a *prima facie* case.

### b.  Legitimate non-discriminatory reason

TriMet argues that it did not promote Davis to the positions because other, more qualified candidates applied. This is a legitimate, non-discriminatory reason.

### c.  Pretext

A plaintiff may show that a defendant's non-discriminatory reason is pretextual either with indirect evidence, by convincing the court that the explanation is not credible, or with direct evidence, by showing that the defendant's action was more likely than not motivated by a discriminatory purpose. *Snead*, 237 F.3d at 1093-94. These forms of evidence are not mutually exclusive and the Court must consider the cumulative evidence presented by the plaintiff. *Id.* at 1094. A plaintiff need not introduce additional, independent evidence of discrimination beyond what was relied on in establishing the plaintiff's *prima facie* case. *Id.*

A plaintiff "need produce very little evidence in order to overcome an employer's motion for summary judgment" because "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang*, 225 F.3d at 1124 (quotation marks omitted)); *see also McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004) ("In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."); *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) (holding that "very little . . . evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder").

Here, Davis's evidence is sufficient to raise an issue of fact as to whether TriMet's purported reason is pretextual. Possible methods of demonstrating pretext include evidence of the employer's general policy and practice with respect to minority employment. *McDonnell*

PAGE 45 – OPINION AND ORDER

*Douglas*, 411 U.S. at 804-05. Davis provides evidence that TriMet directly promotes Caucasian employees without an open application, and TriMet offers no evidence that any minority employees were similarly promoted. Davis also provides evidence that when she was promoted to Assistant Manager, Field Operations in 2007, her colleague Assistant Managers in Field Operations included Jay Jackson, Dennis Van Dyke, and Don Allison. All three are white males, all three have subsequently been promoted within TriMet (whereas Davis has not), and all three only have a high school diploma, whereas Davis has a bachelor's degree and two associate's degrees. Further, when Davis was laid off from her Assistant Manager, Field Operations position in 2009, a Caucasian male who had been promoted to Assistant Manager, Field Operations after Davis was not laid off.

Additionally, the record contains evidence that TriMet's proffered explanation is "unworthy of credence." For example, TriMet asserts that Davis was not qualified for the Director of Maintenance position because she did not have the "applicable" Bachelor's degree and ten years' experience in the areas of fleet maintenance, transportation management, engineering, or a related discipline. Davis has a bachelor's degree in Information Technology, an associate's degree in Diesel Maintenance, and an associate's of applied science degree in Business Industry. The Caucasian male candidate who was awarded the position does not have a bachelor's degree or even an associate's degree. At the time she applied for this position, Davis also had more than 16 years' experience working at TriMet in fleet maintenance and transportation, including two years' managerial experience, and more than eight years' experience in fleet maintenance and transportation supervision in the military.[16]

---

[16] Davis avers to facts regarding her military experience in her declaration, and repeatedly references the fact that this information was provided to TriMet via Davis's Military Experience

Davis also applied for a position as an Assistant Manager, Field Operations in September 2010. TriMet asserts that Davis was not as qualified as the successful candidate, a Caucasian male, who had one year of previous experience as an Assistant Manager, Field Operations, and fifteen years' experience as a Field Operations Supervisor.[17] Davis, however, had more than two years of previous experience as an Assistant Manager, Field Operations, and also had several years of supervisory experience in the military. The evidence does not support a finding, as a matter of law, that Davis was not as qualified as the successful candidate. This issue is for the fact-finder.

As noted above in discussing Davis's claim for disability discrimination, it is in the subjective component of the interview that Davis scores significantly lower than her Caucasian fellow applicants, which requires more scrutiny into the attitudes and motivation of the employer. *Lyn*, 656 F.2d at 1343 & n. 5.

### 2. Retaliation based on race

Davis's Amended Complaint alleges a claim for retaliation under O.R.S. § 659A.030. Davis, however, offers no argument in response to TriMet's motion for summary judgment against Davis's claim for retaliation based on race, and, in fact, states only that she brought claims for race discrimination. TriMet argues that because Davis failed to respond to TriMet's

---

DD form 2586. It does not appear, however, that Davis submitted this form in the summary judgment record.

[17] The evidence is unclear as to whether the successful candidate held a supervisory position for the entire 15 years, or whether at the time he left that position he was a supervisor. His application states that he started the position of Field Operations Supervisor in Portland, Oregon in 1987, which was apparently his first position with TriMet. His application, however, also asserts that he was obtaining his degree in Klamath Falls until 1988. Thus, it is unclear whether TriMet initially hired him in a supervisory role while he was attending college in Klamath Falls or whether he was hired in field operations and later promoted to a supervisory role.

PAGE 47 – OPINION AND ORDER

motion, summary judgment must be granted against Davis race retaliation claim. A court may

not, however, grant summary judgment by default. *See Heinemann v. Satterberg*, 731 F.3d 914,

916-17 (9th Cir. 2013). When a party fails to respond to a fact asserted by the movant, a court

may:

> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting
> materials—including the facts considered undisputed—show that
> the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). This rule was amended in 2010 to incorporate the "deemed admitted"

practice of many courts—where a party fails to respond to an asserted fact, that fact may be

"deemed admitted" (considered as undisputed). *Heinemann*, 731 F.3d at 917.

Considering a fact as undisputed, however, does not mean summary judgment may

automatically be granted. A court must still determine, considering the facts the court has found

undisputed for want of a response and those that cannot be genuinely disputed despite a proper

response, the legal consequences and proper inferences to be drawn from those facts. *Id.* (quoting

Fed. R. Civ. P. 56 Advisory Committee Notes (2010)). Accordingly, the Court considers Davis's

race retaliation claim in light of the undisputed facts.

Race retaliation claims under O.R.S. § 659A.030(1)(f) are analyzed under the same

framework as retaliation claims under Title VII. *See, e.g.*, *Portland State Univ. Chapter of Am.*

*Ass'n of Univ. Professors v. Portland State Univ.*, 352 Or. 697, 712-13 (2012) (comparing

O.R.S. § 659A.030(1)(f) to the Title VII anti-retaliation provision); *Pool v. VanRheen*, 297 F.3d

899, 910 (9th Cir. 2002) (finding that "Or. Rev. Stat. 659A.030 was modeled after Title VII" and

assessing O.R.S. § 659A.030(1)(f) under Title VII case law).

"To establish a prima facie case of retaliation, a plaintiff must prove (1) she engaged in a

protected activity; (2) she suffered an adverse employment action; and (3) there was a causal

connection between the two." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). Here, Davis alleges that she engaged in the protected activities of: (1) sending a tort claims notice to TriMet on June 10, 2009 and December 17, 2009, notifying TriMet of Davis's intent to file a lawsuit alleging, among other things, discrimination based on race; (2) filing a complaint with the Bureau of Labor and Industries in February 2011 alleging that TriMet discriminated against her because of, among other things, her race; and (3) reporting discrimination because of, among other things, her race on September 7, 2012.

The Court finds that the time loss letters suffice as adverse employment actions in the retaliation context, which includes "any action reasonably likely to deter employees from engaging in protected activity" *Pardi v. Kaiser Found. Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004) (quotation marks omitted). Although the time loss letters did not affect Davis's employment or alter the conditions of the workplace, they spoke of the possibility of setting and enforcing attendance goals or conditions in the future. They were also placed into her personnel file, maintenance employee file, and provided to her supervisor. The Court finds that receiving this type of communication from one's employer might dissuade a reasonable worker from exercising his or her protected rights. Thus, this alleged conduct amounts to potentially actionable retaliation. As discussed above, TriMet's failure to promote Davis is also a potentially actionable adverse employment action.

There is no evidence, however, of a causal link between Davis's alleged protected activity and the alleged adverse employment actions. Additionally, knowledge of the protected activity by the decisionmaker is required in order to make a *prima facie* claim of retaliation. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) ("In order to prevail, [plaintiff] must present evidence from which a reasonable trier of fact could conclude

that the [decisionmakers] who refused to hire her were aware that she had engaged in protected activity."). Here, Davis provides no evidence that the persons sending her the time loss letters or interviewing her or otherwise making the hiring decisions on the positions to which she applied had knowledge of her alleged protected activity. Thus, Davis fails to establish a *prima facie* case of race retaliation.

### 3. Conclusion

Viewing the evidence in the light most favorable to Davis and considering "the importance of zealously guarding an employee's right to a full trial" in discrimination cases, *McGinest*, 360 F.3d at 1112, the Court finds that Davis has produced sufficient evidence to withstand TriMet's motion for summary judgment against Davis's race discrimination claim for TriMet's failure to promote her. Summary judgment is granted, however, against Davis's racial discrimination claim based on the vague allegations that TriMet prevented her from being successful, failed to provide training, failed to transfer her, or demoted her, and against Davis's claim of race retaliation.

## F. Seventh Claim for Relief—ADA Retaliation

### 1. *Prima Facie* case

Davis brings a claim for retaliation under the ADA, 42 U.S.C. § 12203(a). To state a *prima facie* case of retaliation, a plaintiff must allege "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1269 (9th Cir. 2009) (citation and quotation marks omitted). A retaliation claim does not necessarily depend on a plaintiff proving that he or she is disabled within the meaning of the ADA. *Id.* A request for a reasonable accommodation is a protected activity under the ADA. *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th

Cir. 2004) ("[Plaintiff] was engaged in a protected activity when he requested that [employer] make reasonable accommodations for his alleged disability.").

As with Davis's claim for race retaliation, for purposes of Davis's claim for retaliation under the ADA, the time loss letters and the failure to promote Davis to positions to which she applied are adverse employment actions.

With respect to the time loss letters, Davis requested an accommodation on February 2, 2010, and on February 8, 2010 TriMet ran an absence history for her. On March 8, 2010, she complained of discrimination based on her disability and TriMet ran absence report on her and issued her a time loss letter the next day. On March 9, 2010, Davis requested an accommodation and TriMet issued her a time loss letter that same day. On March 24, 2010, she again received time loss letters and was required to attend a meeting with her supervisor. In March 2012 Davis requested an accommodation of an ergonomic assessment and in April 2012 and June 2012 she received time loss letters. This is sufficient indirect evidence to meet Davis's *prima facie* burden.

### 2. Legitimate non-discriminatory reason

TriMet argues that it had legitimate non-discriminatory reasons for sending Davis the time loss letters. TriMet contends that it had a legitimate interest in enforcing its company-wide attendance policy consistently and that when it sent Davis the time loss letters it was only seeking to inform Davis that she was in violation of that policy. This is a legitimate, non-discriminatory reason.

TriMet also argues that it did not promote Davis because other, more qualified candidates were promoted instead. This is a legitimate, non-discriminatory reason.

### 3. Pretext

The Court finds that the close temporal proximity between Davis's requests for accommodations and TriMet's issuance of the time loss letters creates an issue of fact as to

whether TriMet's proffered reasons for sending the time loss letters are pretextual. When causation is inferred from timing alone, a court should not use a mechanical formulation and should consider the surrounding facts. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009). Temporal proximity of several months and less, however, have been regularly considered sufficient to support an inference of causation. *See Id.* (two-and-one-half months); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004) (three months); *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) (seven weeks); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (three, five, and eight months, respectively, all sufficient to support an inference of causation); *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989) (two months); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (three months). Here, the alleged adverse actions occur from one day to a few months from the alleged protected activity.

Davis does not, however, provide sufficient evidence TriMet failed to promote her because she requested an accommodation or otherwise engaged in protected activity under the ADA. Although Davis has presented evidence sufficient to create an issue of fact as to whether she was discriminated against because of her disability (because she was penalized in the hiring process for her absences, which were arguably caused by her disability), the same evidence does not support an inference that she was penalized in the hiring process for requesting an accommodation. Davis offers no evidence that her request for an accommodation, as opposed to her absences themselves, was a substantial factor in TriMet's decision not to hire her for any of the positions for which she applied.

### 4.  Conclusion

TriMet's motion for summary judgment against Davis's ADA retaliation claim is denied with respect to the alleged adverse employment action of sending Davis time loss letters, but

granted with respect to all other alleged adverse employment actions, including TriMet's failure to promote Davis.

## G. Eighth and Ninth Claims for Relief—FMLA and OFLA Violations

### 1. Legal standards

Davis alleges that she took protected medical leave and that TriMet "interfered, discriminated, and retaliated" against her for taking that medical leave, in violation of the FMLA. When a plaintiff alleges retaliation for exercising his or her rights under the FMLA, in the Ninth Circuit such a claim is properly analyzed as an "interference" claim under under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *See Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("By their plain meaning, the anti-retaliation or anti-discrimination provisions do not cover visiting negative consequences on an employee simply because he has used FMLA leave. Such action, is instead, covered under § 2615(a)(1), the provision governing 'Interference [with the] Exercise of rights.'" (alteration in original)); *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 n.7 (9th Cir. 2003) (noting that some circuits have held that claims in which the plaintiff alleges that he or she was subjected to an adverse employment action for taking FMLA protected leave are properly brought under Section 2615(a)(2), but that in the Ninth Circuit such claims are properly brought under Section 2615(a)(1), and that 2615(a)(2) applies only to employees who oppose employer practices made unlawful by the FMLA).[18] Thus, Davis's FMLA claim is one for interference.

---

[18] Claims under Section 2615(a)(2) and Section 2615(b) are known as "discrimination" or "retaliation" claims. *See Bachelder*, 259 F.3d at 1124; *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011). Section 2615(a)(2) provides, "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice

To sustain an FMLA interference claim, a plaintiff must show by a preponderance of the evidence that: (1) the plaintiff took or requested protected leave; (2) the employer subjected the plaintiff to an adverse employment action; and (3) the taking of or requesting protected leave was a "negative factor" in the adverse employment decision. *See Bachelder*, 259 F.3d at 1125; *McCauley v. ASML US, Inc.*, 917 F. Supp. 2d 1143, 1152 (D. Or. 2013); 29 C.F.R. § 825.220(c). OFLA claims are to "be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]." O.R.S. § 659A.186(2).

For an interference claim, the employee "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in" an employment decision. *Bachelder*, 259 F.3d at 1125. The employee may prove interference using "either direct or circumstantial evidence, or both." *Sanders*, 657 F.3d at 778. This method of proof contrasts with the *McDonnell Douglas* burden-shifting framework and the *McDonnell Douglas* burden-shifting framework does not apply to FMLA interference claims. *Xin Liu*, 347 F.3d at 1136; *Bachelder*, 259 F.3d at 1125.

### 2.  Failure to promote

As discussed above, TriMet gave Davis a score of "zero" for attendance in the application process for the Assistant Manager, Field Operations position. TriMet offers no evidence demonstrating that the score of zero was only for absences unrelated to Davis's protected leave. Thus, there is an issue of fact as to whether TriMet interfered with Davis's rights under the FMLA by penalizing her in the promotion process for taking protected leave.

---

made unlawful by this subchapter." Section 2615(b) provides that it is unlawful for an employer to discharge or in any other manner discriminate against any individual who has (1) filed a charge or instituted a proceeding under the FMLA; (2) given or is about to give testimony in a proceeding under the FMLA; or (3) given or is about to give information relating to a proceeding under the FMLA.

Additionally, the evidence that Mr. Talbot, Director of Operations at TriMet, listed "attendance" as a factor important to TriMet in making promotional decisions, without indicating that protected absences will not be considered negatively, is evidence from which a reasonable juror could infer that when considering Davis for the promotions to which applied TriMet penalized Davis for her attendance issues. Further, as discussed above with respect to disability discrimination, the fact that Davis scored significantly lower in the subjective interview scores supports her claim that her protected absences negatively impacted her application scores. Thus, Davis has produced sufficient evidence to create an issue of fact as to whether her taking of FMLA-protected leave constituted a negative factor in TriMet's decision not to promote Davis to the positions for which she applied.

### 3. Time loss letters

Although not labelled a "retaliation" claim in the Ninth Circuit, the claim brought by Davis is substantively a retaliation claim—that TriMet retaliated against her for using FMLA-protected leave. Thus, what constitutes an adverse employment action is broader than in the discrimination context and includes "any actions that would dissuade a reasonable employee from exercising his rights under the FMLA." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008). As discussed above, the time loss letters constitute an adverse employment action in the retaliation context.

Plaintiff was on protected leave until February 5, 2010. On March 9, 2010, Davis's supervisor sent Davis a time loss letter regarding issues with her attendance and stating that she had missed 218 hours in the last twelve months. TriMet offers no evidence that the 218 hours referenced in the letter did not include protected leave time. On March 24, 2010, Davis received additional letters relating to her attendance issues and the Court cannot determine, as a matter of law, that Davis's protected leave was not a negative factor in TriMet's decision to send these

letters. During the next two years, Davis took protected leave when it was available and continued to receive time loss letters. There is no evidence that those additional time loss letters did not include protected leave time. Thus, there is an issue of fact as to whether TriMet retaliated against Davis for using protected leave by sending the time loss letters.

### 4. Conclusion

TriMet's motion for summary judgment against Davis's FMLA and OFLA claims is denied with respect to TriMet's failure to promote Davis after November 2009 and the time loss letters. TriMet's motion for summary judgment is granted with respect to all other alleged adverse employment actions.

## H.  Tenth Claim for Relief—Wrongful Discharge

Davis brought a claim for wrongful discharge under Oregon common law. She concedes TriMet's motion for summary judgment against this claim. Accordingly, TriMet's motion for summary judgment against Davis's claim for wrongful discharge is granted.

## CONCLUSION

TriMet's motion for summary judgment (Dkt. 61) is GRANTED IN PART and DENIED IN PART. The parties shall lodge a pretrial order pursuant to Local Rule 16-5(b) consistent with the Court's ruling not later than 45 days following this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 8th day of September, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge